**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MARY CHAMBERLAIN, as Executrix of the**
**Estate of Margaret R. Chamberlain,**

                               **Plaintiff,**

    vs.                                                06-CV-0646
                                                                (NAM/RFT)

**MICHAEL LEAVITT, as Secretary of the**
**United States Department of Health and**
**Human Services,**

                               **Defendant.**
_____

**APPEARANCES:**                                **OF COUNSEL:**

Mary Chamberlain
30 Fulton Street
Glens Falls, NY 12801
*Plaintiff Pro Se*

Andrew T. Baxter                         Diane J. Cagino, Esq.
Acting United States Attorney for
the Northern District of New York
445 Broadway, Rm. 218
Albany, NY 12207-2924
*Attorneys for Defendant*
and
Office of General Counsel                   Michael R. Fry, Esq.
Department of Health & Human Services    Assistant Regional Counsel
Office of General Counsel
601 East 12th Street, Rm N1800
Kansas City, MO 64106
*Attorneys for Defendant*

**NORMAN A. MORDUE, Chief U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.     INTRODUCTION**

Plaintiff Mary Chamberlain brings the above-captioned action pursuant to 42 U.S.C. § 1395ff(b) of the Social Security Act, seeking review of the decision of the Secretary of Health and Human Services ("Secretary") denying Medicare benefits to Margaret Chamberlain ("Beneficiary" or "Patient") under 42 U.S.C. § 1395d(a)(2)(A). (Dkt. No. 1).  This action involves payment for services and treatment from December 17, 2001 through December 28, 2001.  Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## II.     FACTUAL BACKGROUND

On December 3, 2001, Margaret Chamberlain was admitted to Fort Hudson Nursing Home.[1]  The patient was a resident of Fort Hudson until March 2002 and died in April 2002. (T. 204).   Plaintiff brought this action on her mother's behalf.

Admission Records

On December 3, 2001, the patient, then 84 years old, was transferred from Eden Park Nursing Home in Glens Falls, N.Y. to Fort Hudson Nursing Home in Fort Edward, N.Y.  (T. 55).  Upon admission, the attending physician was Dr. Larson.  (T. 199BR).  At the time of admission, the attending registered nurse prepared a Patient Transfer Form and noted the patient's diagnosis as "Alzheimer's and dementia".[2] (T. 55). The nurse noted the patient had a history of deep vein thrombosis, paranoid behavior, atrial fibrillation, vascular dementia, alcoholism, vitamin B12

---

[1] The records that are unrelated to the relevant period and issues have been omitted from this discussion.

[2] The name of the attending registered nurse who prepared the Patient Transfer Form is illegible.  (T. 55-56).

deficiency, depression and right breast cancer with lymphedema of the right arm.[3] (T. 61). The patient was noted as "pleasant and quiet with limited mobility". (T. 199BR). The nurse also noted the patient could feed herself with her left hand but needed assistance to eat. (T. 56). The nurse noted the patient was previously "determined not to be a candidate for further therapy including physical, occupational, and speech [sic] secondary to her dementia and lack of progress in therapies at time of admission". (T. 55).

The nurse noted that on October 8, 2001, Dr. Mastrodeneto recommended a fat based nutritional supplement.[4] (T. 56). The nurse also noted that on November 5, 2001, Dr. Jorgensen recommended discontinuing physical therapy and "no further treatment from therapies".[5] (T. 56). The nurse also noted that on November 20, 2001, Dr. Lenihen found the patient's symptoms consistent with dementia with no evidence of Parkinson's or depression.[6] (T. 56). The nurse noted plaintiff frequently visited her mother and the patient had a brother in Buffalo who was "supportive". (T. 56).

On December 3, 2001, Dr. Larson prepared a Certification stating "SNF services are required to be given on an inpatient basis because of the above named patient's need for skilled

---

[3] Deep vein thrombosis is a stationary blood clot along the wall of a blood vessel of one or more deep veins, usually of the lower limb, characterized by swelling, warmth, and erythema. *Dorland's Illustrated Medical Dictionary*, 1948 (31st ed. 2007).

[4] The record does not indicate whether or not Dr. Mastrodeneto was specialized in any area of medicine. The record does not contain any reports from Dr. Mastrodeneto.

[5] The record does not indicate whether or not Dr. Jorgensen was specialized in any area of medicine. Plaintiff asserts that Dr. Jorgensen was a physiatrist. (T. 222). The record does not contain any reports from Dr. Jorgensen.

[6] The record does not indicate whether or not Dr. Lenihen was specialized in any area of medicine. Plaintiff asserts that Dr. Lenihen was a neurologist. (Dkt. No. 25). The record does not contain any reports from Dr. Lenihen.

nursing care on a continuing basis for the condition(s) for which he/she was receiving inpatient hospital services prior to his/her transfer to the SNF". (T. 199E).

On December 3, 2001, a Comprehensive Care Plan was prepared targeting the patient's various problems including impaired decision making due to dementia, poor nutrition and incontinence, deficits in self care, lymphedema, anemia, risk of bleeding and unsteady gait/weakness. (T. 199AP - 199AV).

Therapy Records

On December 4, 2001, the patient underwent an evaluation by a physical therapist.[7] (T. 58). The patient was diagnosed with "difficulty ambulating/unsteady gait". (T. 58). The therapist noted the patient required minimal assistance/supervision for activities of daily living and mobility. (T. 199AB). The therapist recommended the patient receive physical therapy "for maintenance" twice a week for 30 days. (T. 58, 199AB). From December 17, 2001 through December 28, 2001, the patient received three physical therapy treatments. (T. 63).

On December 7, 2001, an occupational therapist evaluated the patient.[8] (T. 199AA). The therapist noted the patient was alert and oriented with decreased short and long term memory. (T. 199AA). The therapist noted the patient ate independently but required assistance dressing, toileting, bathing and with hygiene. (T. 199AA). The therapist noted "no further occupational therapy required". (T. 199AA).

On December 17, 2001, an occupational therapist evaluated the patient for "screening of

---

[7] The record does not contain the name of the therapist who conducted this evaluation.

[8] The name of the therapist who performed the evaluation is illegible.

adaptive silverware and plate".[9]  (T. 62).  The therapist noted the patient was able to feed herself with her left hand, manipulate a fork successfully and drink from a variety of containers. (T.62). The therapist noted the patient had difficulty with her spoon. (T. 62). The therapist recommended a plate guard and built-up handle for the patient's spoon. (T. 62).

On December 27, 2001, the patient's social worker, Tina M. Golden, noted the patient was "settling in" but "her daughter has some adjustment problems". (T. 65).

Progress Records

On December 12, 2001, a "Progress Note" was prepared entitled "New Admission".[10] The evaluator found the patient's right arm edema had decreased and the patient had not exhibited any agitated episodes since her admission.[11] (T. 61).  The evaluator also noted the patient "ambulated" with assistance and was comfortable but disoriented as to place. (T. 61).  The evaluator noted the patient was a " well developed, thin lady weighing 85 pounds on admission" with "multiple problems - all stable". (T. 61). The evaluator noted the patient's daughter provided protein drinks. (T. 61).

For the relevant time period, some daily progress notes were prepared by licensed practical nurses.[12]  On December 18, 2001, the nurse noted "PT 18.6" and "INR 1.9" and "levels WNR per Dr. Larsons order".[13] (T. 60). On December 22, 2001, the attending nurse noted "PSE

---

[9] The name of the therapist that performed the December 17, 2001 evaluation is not in the record.

[10] The record is unclear as to whether or not the patient was discharged from the SNF and readmitted on December 12, 2001.  Plaintiff asserts there was no readmission. (Dkt. No. 25, p. 1).  Defendant claims the patient was readmitted on December 12, 2001. (Dkt. No. 22, p. 6).

[11] The name and qualifications of the individual who prepared the "progress note" is not in the record.

[12] The names of the nurses are either illegible or omitted from the record.

[13] INR is an abbreviation for coagulant response time.  http://www.jdmd.com (last visited May 22, 2008).

given 11-7 with negative results".[14] (T. 60).  On December 24, 2001 and December 25, 2001, the nurse noted the patient was provided with a rectal suppository to aid with elimination. (T. 60). On December 25, 2001 the nurse indicated the patient was "off premises with her family until 5:00 p.m." (T. 60).  On December 26, 2001, the nurse noted the patient continued to drink well but ate very little solid food. (T. 60).  On December 28, 2001, the nurse noted the patient was suctioned for small amounts of phlegm with some effect.  (T. 60).

A Special Care Daily Report/Intake and Output form was prepared regarding the patient's nutrition.  From December 17, 2001 through December 28, 2001, the patient's caloric intake (by mouth) was monitored daily by a licensed practical nurse.[15] (T. 199AF).

Physician Orders/Medications

On December 12, 2001, the attending physician prepared  "Physicians Orders".[16] (T. 57). Pursuant to the Order, the patient was prescribed Atenolol[17], Coumadin[18], and Lanoxin[19]  (orally) once a day and Exelon[20] (orally) twice a day.[21]  (T. 57).  The patient was also prescribed

---

[14] PSE is an abbreviation for present state examination. http://www.rxpgonline.com (last visited May 22, 2008).

[15] The name(s) of the nurse(s) who monitored the patient's nutrition is not in the record.

[16] The name of the attending physician is illegible.

[17] Atenolol is used in the treatment of hypertension. *Dorland's* at 173.

[18] Coumadin is used in the treatment and prophylaxis of thromboembolic disorders. *Id.* at 432, 2103.

[19] Lanoxin increases the force of contraction of cardiac muscles and is used as a cardiotonic and antiarrhythmic. *Id*. at 525, 1019.

[20] Exelon is used in the treatment of mild to moderate dementia of the Alzheimer type.  *Id*. at 666, 1675.

[21] The record contains the abbreviation "p.o." (by mouth, orally) and the abbreviation "QD" or "quoque die" (once a day). http://www. medilexicon.com (last visited May 20, 2008).

intramuscular injections of Folic Acid and Thiamine HCL to be administered once a week.[22] (T. 57). An intramuscular injection of vitamin B12 was prescribed to be administered once every two weeks. (T. 57). The physician's "standing orders" included therapy evaluations, a regular diet with thin liquids and a "siderail". (T. 57).

From December 17, 2001 through December 28, 2001, a Medication Record was prepared.[23] The record indicated the patient received two intramuscular injections of Thiamine HCL and one intramuscular injection of Vitamin B12 and Folic Acid. (T. 199BV).

Administrative Records

On December 14, 2001, Amy Adams, R.N., Administrative Officer/Nurse Assessment Coordinator, issued a "NF Determination on Continued Stay" to plaintiff. (T. 199N). Ms. Adams stated that "skilled nursing or rehabilitation services were no longer needed on a daily basis and therefore, the patient's stay after December 16, 2001 would not be covered under the Medicare benefit". (T. 199N). Ms. Adams stated that the report "confirmed my telephone conversation with you today". (T. 199O). Ms. Adams also noted plaintiff wanted the bill to be submitted to an intermediary for a Medicare decision. (T. 199P).

On December 16, 2001, Dr. Larson did not complete a "recertification" for the patient and noted "skill off MC-A 12/16/01". (T. 199E).

On December 16, 2001 and December 18, 2001, Amy Adams, R.N., completed a Minimum Data Set (MDS) for Nursing Home Resident Assessment and Care Screening. (T. 199AW). The form was completed with the assistance of other nurses and therapists who

---

[22] Thiamine HCL is used for the prophylaxis and treatment of vitamin B1deficiency. *Dorland's* at 1943.

[23] The name of the individual who prepared the Medication Record is not in the record.

provided treatment to the patient.[24] (T. 199AW). Ms. Adams noted the patient did not display any indicators of delirium, problems with long term memory or cognitive skills but exhibited problems with short term memory and daily decision making. (T. 199AY). Ms. Adams found the patient had no communication/hearing problems, no vision problems and exhibited no patterns of depression, anxiety or "sadness". (T. 199AZ). Ms. Adams noted patient's weight as 96 pounds with "no nutritional problems". (T. 199BB).  Ms. Adams noted the patient was prescribed 8 different medications, however, the patient had not received any injections "in the last 7 days". (T. 199BC). Ms. Adams noted the patient required physical assistance moving in her bed, transferring, walking, dressing, eating, toilet use and personal hygiene. (T. 199AZ).

On March 12, 2002, the patient's attending nurse, dietary therapist, social worker, physical therapist and recreational therapist completed an Interdisciplinary RAP's (Resident Assessment Protocol) Summary Narrative for the period from December 10, 2001 until March 2, 2002. (T. 199S). During that time, the patient had prescriptions for 10 different medications including "IV vitamins". (T. 199S). The patient was noted as "incontinent of bowel and bladder" with assistance required using the bathroom. (T. 199T). The patient's weight, as of February 2002, was 85 pounds. (T. 199T). The attending nurse, Beth Bruno, R.N., noted the patient was vague and quiet but that she presented "no s/s of a delirium". (T. 199S). Nurse Bruno noted the patient was depressed and disoriented to time and place but exhibited no episodes of delusions or agitation. (T. 199T). Nurse Bruno noted the patient was able to read the newspaper daily and feed herself with set up "prn assistance and much enc to eat". (T. 199S). Nurse Bruno noted the patient required assistance and supervision secondary to a swallowing dysfunction. (T. 199S).

---

[24] The names and certifications of the individuals who assisted Ms. Adams with the completion of the MDS are illegible.

Nurse Bruno stated the patient needed verbal cues to assist with her communication and personal care. (T. 199S). The nurse further stated the patient required assistance from one person to transfer, propel her wheelchair and ambulate with her walker. (T. 199S).

Tina Golden, the patient's social worker, stated that the patient received IV vitamins on a weekly basis at the insistence of plaintiff. (T. 199T). The patient's dietary therapist, Caroline Cooney, noted the patient had problems swallowing and was placed on a thin liquid diet. (T. 199T). Ms. Cooney noted the patient had a "significant weight loss" since admission but did not utilize a feeding tube. (T. 199T). Ms. Cooney recommended decreasing the patient's "psych meds" to alter her appetite. (T. 199U). The patient's recreational therapist noted the patient enjoyed visits from local high school students and engaged in brief conversations with other residents. (T. 199T).

## III.   PROCEDURAL HISTORY

On December 14, 2001, plaintiff was advised that services for the beneficiary would no longer be covered under Medicare beginning December 17, 2001. (T. 51). Upon receipt of the notification, plaintiff opted to have the charges for services submitted to a fiscal intermediary for a Medicare decision.[25] (T. 169). On March 8, 2003, the fiscal intermediary, Empire Medicare Services ("Empire") confirmed that the provider's determination of noncoverage was correct. (T. 169). Upon request for reconsideration, that decision was upheld on September 2, 2003. (T. 138).

---

[25] A fiscal intermediary, through its contract with the Center for Medicare and Medicaid Services ("CMS"), administers the Medicare program. The fiscal intermediary makes payments for Medicare Part A claims, as well as rejects or adjusts claims for which it has determined that the services provided were not reasonable, medically necessary, properly provided, or the claim does not properly reflect the kind and amount of the services that were provided to the beneficiary. 42 C.F.R. §§ 421.3, 421.103(a); *see also Estate of Frohnhoefer v. Leavitt*, 2007 WL 841917, at *2, n. 1 (E.D.N.Y. 2007).

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was held on June 3, 2005. (T. 200). On August 2, 2005, ALJ Thomas P. Zolezzi issued a decision and found that the services at issue were excluded from Medicare coverage. (T. 52). The ALJ concluded that the services provided to the beneficiary by Fort Hudson Nursing Home from December 17, 2001 through December 28, 2001 were not skilled services provided on a daily basis. (T. 51). The ALJ further found that "the beneficiary, through her daughter, knew because of written and telephone notice that the items or services provided were excluded from Medicare coverage". (T. 51). The Medicare Appeals Council denied plaintiff's request for review on March 22, 2006, making the ALJ's decision the final determination of the Secretary. (T. 1). This action followed.

## IV.  STATUTORY AND REGULATORY BACKGROUND

The Medicare program, established under Title XVIII of the Social Security Act (commonly known as the Medicare Act, codified at 42 U.S.C. § 1395 et seq.), pays for covered medical care to eligible elderly and disabled persons. 42 U.S.C. §§ 1395-1395ggg; *Estate of Frohnhoefer v. Leavitt*, 2007 WL 841917, at *1 (E.D.N.Y. 2007). The Department of Health and Human Services, through the Secretary, administers the Medicare program and has delegated this function to the Center for Medicare and Medicaid Services ("CMS"). *Estate of Frohnhoefer*, 2007 WL 841917, at *1. Title XVIII Part A of the Medicare Act provides for payment of insurance benefits for acute care given in a hospital and extended care services given in a skilled nursing facility. 42 U.S.C. § 1395(c) et seq.; *Colino v. Sullivan*, 1990 WL 310438, at *2 (E.D.N.Y. 1990).

Skilled care is covered under the Act and is defined in the Code of Federal Regulations

10

("Regulations") as care that is "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel." *Colino*, 1990 WL 310438, at *2 (citing 42 C.F.R. § 409.32(a)). Skilled nursing and rehabilitation services, covered pursuant to 42 U.S.C. § 1395f(a)(2)(C) (1982 & Supp. II 1984, Supp. III 1985), are defined in the regulations as services that are provided on a daily basis in a skilled nursing facility and that: "(1) [a]re ordered by a physician; (2) [r]equire the skills of technical or professional personnel such as registered nurses, licensed practical (vocational) nurses, physical therapists, occupational therapists, and speech pathologists or audiologists; and (3) [a]re furnished directly by, or under the supervision of, such personnel." 42 C.F.R. § 409.31(a); *see also Friedman v. Secretary of Dep't of Health and Human Servs.*, 819 F.2d 42, 45 (2d Cir. 1987). Also, "as a practical matter", the services must be such that they can be provided only on an inpatient basis in a skilled nursing facility ("SNF"). 42 C.F.R. § 409.31(b)(3). In making a "practical matter" determination, as required by § 409.31(b)(3), consideration must be given to the patient's condition and to the availability and feasibility of using more economical alternative facilities and services. 42 C.F.R. §409.35(a).

Medicare does not cover care that is considered to be merely custodial. 42 U.S.C. § 1395(a)(9); *Colino*, 1990 WL 310438, at *2. Although not specifically defined in the Act, custodial care has been interpreted to mean care that is routine in nature and which can be provided by a nonprofessional or lay person without special skills, and which does not require supervision by trained or skilled personnel. *See Hurley By Hurley v. Bowen*, 857 F.2d 907, 911 (2d Cir. 1988). Examples of personal care services which do not require skilled nursing care include administration of oral medications, application of ointments and treatment of minor skin

problems, prophylactic and palliative skin care, routine care in connection with braces and similar devices, and assistance in activities of daily living ("ADL"). *See* 42 C.F.R. § 409.33(d); *Colino*, 1990 WL 310438, at *2.

"A condition that does not ordinarily require skilled services may require them because of special medical complications." 42 C.F.R. § 409.32(b). Furthermore, overall management and evaluation of a care plan may be considered a skilled service, and the aggregate of services provided by non-professionals may require the involvement of technical or professional personnel to evaluate and manage their provision. *Estate of Frohnhoefer*, 2007 WL 841917, at *5 (citing 42 C.F.R. § 409.33(a)(1)). Observation and assessment of a patient's changing condition is also a skilled service, when it is documented that "the skills of a technical or professional person are required to identify and evaluate the patient's need for modification of treatment for additional medical procedures until his or her condition is stabilized." *Id*.

## V. SCOPE OF REVIEW

This Circuit has observed that the Social Security Act is remedial or beneficent in purpose, and, therefore, to be "broadly construed and liberally applied." *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975) (quoting *Gold v. Secretary of Health, Educ. and Welfare*, 463 F.2d 38, 41 (2d Cir. 1972) (internal citation omitted)). The Secretary's decision regarding the entitlement to benefits must be upheld if supported by substantial evidence. *Friedman*, 819 at 44; *Hurley*, 857 F.2d at 912. While " 'more than a mere scintilla,' " "substantial evidence" is only " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In determining whether the decision is supported by substantial evidence, the

12

Court will review the record as a whole considering evidence that supports the Secretary's conclusion as well as that which detracts from it. *See Friedman*, 819 F.2d at 44; *Alston v. Shalala*, 904 F.2d 122, 126 (2d Cir. 1990). A district court's review of the Secretary's determination is limited to "whether the [Secretary] applied the proper legal standards, whether its factual findings were supported by substantial evidence, and whether [he] provided a full and fair hearing." *Kaplan ex rel. Estate of Kaplan v. Leavitt*, 503 F.Supp.2d 718, 722 (S.D.N.Y. 2007) (quoting *Saul v. Apfel*, 1998 WL 329275, at *3 (S.D.N.Y. 1998).

## VI. DISCUSSION

Plaintiff argues the ALJ's decision is not supported by "hard evidence". (Dkt. No. 17, p. 6). Specifically, plaintiff claims the ALJ erroneously relied upon the accuracy of the charts and failed to contact the patient's treating doctors. (Dkt. No. 17, p. 4, 6, 12; T. 50). The Secretary asserts that substantial evidence in the record supports the ALJ's determination that services provided to plaintiff's mother from December 17, 2001 through December 28, 2001 were not skilled services provided on a daily basis and thus, excluded from Medicare coverage. (Dkt. No. 22, p. 10).

A well-settled proposition regarding social security disability hearings is that "[i]t is a basic obligation of the ALJ to develop a full and fair record." *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991) (quoting *Smith v. Secretary of Health, Educ. and Welfare*, 587 F.2d 857, 860 (7th Cir. 1978)). Applying the principles from Social Security disability benefit cases to those involving Medicare claims, the Secretary (through the ALJ) would have the duty to fully and fairly develop the record. *Thompson*, 933 F.2d at 585. This duty includes seeking clarification when a crucial issue is underdeveloped. *Hill, on Behalf of Hill v. Leavitt*, 2007 WL

13

1074090, at *1 (D.N.D. 2007) (citing *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005)).

In the instant case, plaintiff was not represented by counsel, accordingly, the Court must apply a heightened standard of review. *See Lopez v. Secretary of Health and Human Servs.*, 728 F.2d 148, 149 (2d Cir. 1984) (quoting *Echevarria v. Secretary of Health and Human Servs.,* 685 F.2d 751, 755 (2d Cir. 1982)). When the plaintiff is unassisted by counsel, the ALJ has the duty "to scrupulously and conscientiously probe into, inquire of, and explore all the relevant facts." *Gold*, 463 F.2d at 43. This heightened obligation involves, *inter alia*, the duty to ensure that the claimant secures all of the relevant medical testimony; the duty to call the claimant's physicians to testify; and the duty to instruct the claimant of his right to subpoena and cross-examine physicians. *Dawson v. Apfel*, 1997 WL 716924, at *7 (S.D.N.Y. 1997); *see also Echevarria*, 685 F.2d at 756. Where a claimant is unrepresented and plainly unequal to the task of developing her own record, the failure of the administrative judge to "call witnesses or to indicate that she ought to do so" can result in less than a fair hearing. *Fernandez v. Schweiker*, 650 F.2d 5, 8 (2d Cir. 1981) (citing *Gold*, 463 F.2d at 43-44). A hearing may be characterized as "unfair" where the ALJ failed to discharge his obligation to develop a complete record. *Jozefick v. Shalala*, 854 F.Supp. 342, 348 (D. Pa. 1994) (citing *Livingston v. Califano*, 614 F.2d 342, 345 (3rd Cir. 1980)).

In this case, plaintiff was the only witness to testify at the administrative hearing which was 41 minutes in length. *See Floyd v. Schweiker*, 550 F.Supp. 863, 868, n. 1 (D. Ill. 1982) (concluding that the length of the hearing, only 35 minutes, is itself an indicia of insufficiency). At the commencement of the hearing, the ALJ asked plaintiff if she objected to any of the proposed exhibits. (T. 208). Plaintiff repeatedly stated she objected to the record as a whole as

14

"incorrect" and argued that the "charting was abysmal". (T. 208, 220).  The ALJ accepted exhibits from plaintiff that were completely unrelated to the patient or the care she received at Fort Hudson.  (T. 219-221).  The transcript contains numerous indications from the court reporter of "indiscernible" testimony.  The transcript consists almost entirely of a narrative history by plaintiff with the ALJ repeatedly asking the question: "Is that in the record?" or stating: "Okay".  The ALJ made no inquiry regarding key issues including the identity of the patient's attending physicians, therapists or nurses; the patient's daily activities, care and medications; the monitoring of the patient's nutrition and eating; and the number of times plaintiff received intramuscular injections.

The Court finds that the ALJ's questions to plaintiff were indirect, vague and failed to be sufficiently "probing".  *See Cruz v. Sullivan*, 912 F.2d 8, 11-12 (2d Cir. 1990) (concluding that the ALJ failed to ask sufficient questions to fulfill his duty to develop the record for the pro se plaintiff).  The ALJ failed in his duty to develop scrupulously and conscientiously all relevant facts in the administrative record in order to afford claimant a fair and adequate hearing.  *See Losco v. Heckler*, 604 F.Supp. 1014, 1018-20 (S.D.N.Y. 1985).  Moreover, the ALJ took no steps after the hearing to contact the patient's attending physician or to attempt to fill in the gaps in treatment records.  As a result, the record is not fully or fairly developed.

In the decision, the ALJ cites exclusively to the treatment records from Fort Hudson.  Caselaw recognizes the reality that medical records may be incomplete or inaccurate.  *Kono v. Secretary of Dep't of Health and Human Servs.*, 1995 WL 774598, at *4 (Ct. Cl. 1995) (internal citation omitted) (stating that few, if any, medical records deserve to be viewed in isolation). In the decision, the ALJ stated:

15

> At the hearing the appellant reiterated her arguments, and expressed her belief that the beneficiary's charts were not reliable enough to base a determination on whether or not skilled nursing services would be covered. (T. 50).

Clearly, the ALJ acknowledged plaintiff's argument however, the ALJ failed to provide any further explanation or discussion of plaintiff's contentions. Upon a review of the record, the Court notes that the treatment records from Fort Hudson are sporadic, brief and in some instances, illegible. *See Cutler*, 516 F.2d at 1285 (where the medical records are crucial to the plaintiff's claim, illegibility of important evidentiary material has been held to warrant a remand for clarification and supplementation). Throughout the medical record, many reports are not signed, contain illegible signatures, or do not contain the name of the person who prepared the reports. *See Valencia v. Bowen*, 691 F.Supp. 1120, 1125 n. 2 (N. Ill. 1988) (holding that the ALJ could not rely upon physician's unsigned report). The record is devoid of any progress notes or daily entries for at least six days during the relevant time period. Although the treating physician is identified as Dr. Larson, the record does not contain any report, notation or treatment records from Dr. Larson.

Consequently, it is unclear whether or not the ALJ had the full medical record before him when he prepared his determination. *See Hakchareum v. Barnhart*, 2003 WL 22134857, at *2 (N.D. Cal. 2003) (holding that remand was appropriate as the Court could not determine whether the missing records would support the plaintiff's claim). Therefore, the Court concludes that the ALJ's decision to exclude the services at issue is unsupported by substantial evidence. The failure to sufficiently elicit testimony from plaintiff or subpoena any additional witnesses, including but not limited to Dr. Larson, combined with the unreliability and gaps in the medical record resulted in less than a fair hearing for Plaintiff.

In light of plaintiff's continued objection to the accuracy and completeness of the medical records and the unquestionable gap in the record, it was incumbent upon the ALJ to advise plaintiff to call or to subpoena the testimony of one of the patient's attending physicians for a full and fair hearing in this case. *See Cameron v. Bowen*, 683 F.Supp. 73, 77 (S.D.N.Y. 1987); *see also Cutler*, 683 F.Supp. at 77 (concluding that it was incumbent upon the ALJ to fill in the gap in the record by advising the plaintiff to call the treating physician or by holding the record open for a fuller statement from the physician). The ALJ has the power to subpoena evidence "for the purpose of any hearing, investigation, or other proceeding authorized or directed under Title XVIII". *See* 42 U.S.C. § 405(d); *see* 20 C.F.R. § 404.950(d); *see also Carroll v. Secretary of Health and Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983) (holding that such powers were available to remedy evidentiary questions before an ALJ).

Courts have not hesitated to remand for the taking of additional evidence, on good cause shown, where relevant, probative, and available evidence was either not before the Secretary or was not explicitly weighed and considered by him. *Cutler*, 516 at 1285. In any case in which a court determines that the record is incomplete or otherwise lacks adequate information to support the validity of the determination, it shall remand the matter to the Secretary for additional proceedings to supplement the record. 42 U.S.C. § 1395ff(b)(3)(C); *see also Matthews v. Shalala*, 1997 WL 124106, at *2 (S.D.N.Y. 1997). As the ALJ failed to fully and fairly develop the record, the Court is consequently unable to analyze whether or not the patient's care met the proper legal standard for skilled nursing or rehabilitative services.

## VII.   CONCLUSION

Based upon the foregoing, it is hereby

17

**ORDERED** that the decision denying Medicare benefits is **REVERSED** and this matter be **REMANDED** to the Secretary for further proceedings consistent with this Order; and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been rescinded, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit; and it is further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

Dated: February 10, 2009
Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge